CLAUDE E. AND LORNA B. UPTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Upton v. Commissioner
Docket No. 1142-71.
United States Tax Court
T.C. Memo 1976-41; 1976 Tax Ct. Memo LEXIS 362; 35 T.C.M. (CCH) 177; T.C.M. (RIA) 760041; February 18, 1976, Filed Claude E. Upton, pro se. [1]
Richard D. Hall, Jr., and Frederick T. Carney, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief *363 Judge: This case was assigned to and heard by Special Trial Judge Randolph F. Caldwell, Jr., pursuant to Rules 180 and 182, Tax Court Rules of Practice and Procedure. The parties have filed no exceptions of law or fact to Special Trial Judge Caldwell's report. The Court agrees with and adopts his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE CALDWELL, Special Trial Judge: This case was one of a group of 37 which were consolidated for trial, but not for opinion. At the trial, evidence was received which bears upon every case in the group. Such evidence relates to certain contractual arrangements between the husband-petitioners' employers (Lockheed Air Service Company and Dynalectron Corporation) and the United States Air Force, as well as the employment arrangements between field team members (such as the husband-petitioners) and such employers. Respondent determined a deficiency in petitioners' 1969 Federal income taxes in the amount of $239.25. In an amendment to his answer to conform the pleadings to the proof, respondent seeks an increased deficiency in the total amount of $546.45, or an increase of $307.20. The issue is whether all or any portion *364 of $2,637 of per diem payments received by petitioner Claude Upton (hereinafter, "petitioner") from Dynalectron Corporation should be included in his gross income for 1969 under section 61(a) of the Internal Revenue Code of 1954; [2] and, if so, whether petitioner is entitled to deduct any or all of said amount as away-from-home traveling expenses under section 162(a)(2). Respondent's partial disallowance of petitioners' claimed medical expense deduction was based solely on the determined increase in petitioners' adjusted gross income consequent on the inclusion of the per diem payments in gross income. The propriety of the partial disallowance of the medical expense deduction thus depends on the per diem/travel expense issue. FINDINGS OF FACT Petitioners, husband and wife, filed their 1969 return with the Internal Revenue Service Center at Chamblee, Georgia. At the time of filing their petition herein, they resided at Meridian, Mississippi. During 1969, petitioner was employed as a member of four different field teams by Dynalectron Corporation (hereinafter, *365 Dynalectron). Dynalectron, as well as Lockheed Air Service Company (hereinafter, "Lockheed") had a contract with the United States Air Force during 1969, to provide field team services for the maintenance and modification of weapons systems (i.e., aircraft) and/or support equipment. These contracts were called "basic contracts" and the Air Force entered into such a contract with each of three different contractors. The contracts were for three years maximum duration, and those involved here were for the three fiscal years, July 1, 1967-June 30, 1968; July 1, 1968-June 30, 1969; July 1, 1969-June 30, 1970. The contract was firm for the first of the three years; but the Air Force had the unilateral right to extend the contract for the second and third years of the three-year period. The contracts were so extended by the Air Force insofar as both Lockheed and Dynalectron were concerned. (The record herein does not identify the third contractor who had the basic contract.) The basic contract did not, of itself, award any work to be performed thereunder. It did specify the wage rates which would be paid for services rendered by employees of the contractor, if the contractor got work *366 to be performed under the contract. The contract also contained the following provisions relating to the payment of per diem: (ii) Per Diem, not to exceed the applicable amounts set out below, when actually paid by the Contractor and approved by the Administrative Contracting Officer, shall be reimbursed to the Contractor, without regard to the duration of the assignment; provided, however, that no per diem shall be authorized or paid to any employee whose actual residence is within 50 miles of the work station to which the employee is assigned, nor shall any per diem be paid to any employee who actually resides at and commutes from his actual residence during the period of his employment, regardless of the distance between said residence and his assigned work station: (See (ii)(e) below). (a) In the CONUS (No quarters and messing facilities furnished by the Government) -- $11.00-Per day per man for Engineer and Leadman and $9.00-Per day per man for the remainder. * * * * *
(e) For the purpose of this contract the term "actual residence" is defined as the fixed or permanent domicile of an employee. The employee shall certify to the location of his fixed or permanent domicile *367 and this location, if accepted by the Contractor, shall be deemed, for the purpose of this contract, to be the employee's domicile in so far as per diem authorization against this contract is concerned. However, this does not relieve the Contractor of his responsibility to ascertain that the certification is valid. The opportunity for the contractor to perform under the basic contract arose from the issuance by the Air Force of a work order thereunder. Issuance of a work order was entirely within the discretion of the Air Force, and it alone had the discretion to select which one of the three holders of a basic contract that was to perform the work order. Performance under a work order might be at any place in the United States or at any place overseas where the Air Force maintained a base. Under the terms of the basic contract, work orders could only be issued during a given year of a basic contract. However, completion of a work order actually issued during such year might be effected after the end of the year. When the Air Force had determined to issue a work order and had notified a contractor of its selection to perform that order, representatives of the Air Force and of the *368 contractor would get together at a "pre-dock" meeting where the time for completion of the contract and the make-up of the contractor's projected field team complement would be worked out. Determination of the time of performance entailed fixing an input-output schedule -- the schedule which showed the number of units coming into the contractor for its maintenance and modification services per day or week or month, and the number of units to be completed by the contractor per day or week or month. After the projected field team complement had been worked out, the contractor would then proceed to get the team together. In assembling the team, the contractor would utilize two sources of manpower: (1) existing employees which it transferred from jobs under other work orders; and (2) new employees which it recruited. Whenever a contractor hired a new employee for field team work, that employee was advised that he was subject to being sent anywhere that the contractor might be called upon to perform a work order, and that if the employee was unwilling to travel where thus directed to go, his only alternative was to resign. The employee was also advised that the contractor only had a *369 basic contract for a year and that it had no way of knowing whether or when it would receive work orders under that contract. It was also made clear to the employee that, while the contractor would endeavor to continue to utilize the services of the employee after completion of the work order in connection with which he was hired, it could not guarantee any such further employment; and if none were available, the employee would be laid off. Neither Lockheed nor Dynalectron maintained any pool or central area where an employee who had completed an assignment could be sent pending the contractor getting another work order on which such employee could be used. Both Lockheed and Dynalectron were involved in the performance of work orders at Key Field in Meridian, Mississippi, during the years involved. [3]Lockheed had first come to Meridian in 1965 and it remained there until June 30, 1969, at which time (although it did not lose its status as holder of one of the three basic contracts) it was supplanted by Dynalectron. During the fiscal year ended June 30, 1969, Lockheed received two work orders to be performed at Meridian; and during the succeeding fiscal year, Dynalectron likewise *370 received two work orders. While in most instances, the contractor's field teams were sent to the location where the aircraft were located, in the case of the work orders performed at Meridian, the aircraft were brought by the Air Force to that work site from other locations. During the performance of a work order, the Air Force always had an on-site representative, monitoring the performance of the contractor. One of the areas of concern was to determine whether the field team was over strength or under strength, as well as the quality of work of the field team members. Instances occurred when the composition of the field team was changed as the result of the recommendation of the Air Force's on-site representative. For this reason, as well as for the reason that the composition of the field team varied according to the nearness in point of time to the beginning or the end of the performance formance under the work order, the projected field *371 team complement as worked out at the pre-dock meeting might vary as much as 10 to 20 percent during the performance of the contract. When an employee was hired, or rehired, by a contractor, he was required to certify to the contractor his "permanent or domicile" address (in the case of Lockheed) or his "fixed or permanent domicile" (in the case of Dynalectron). If the address so certified was further than 50 miles from the job site where the employee was to work and if the employee did not drive back and forth to work, irrespective of the address which he had furnished, he was paid the per diem mentioned and described above. The per diem payments made by the contractors were included in their invoices to the Air Force, solely for the purpose of being reimbursed. There was no element of profit to the contractors in the per diem for which they sought reimbursement. Per diem paid to the field team employees who qualified therefor was at the rate of $11 per day for a leadman and an engineer, and $9 per day for the other members of the field teams. Per diem was paid for seven days per week, although the regular work week for field team members was a 5-day, 40-hour week. Field team members *372 also received per diem during their initial travel to a work site, for days of travel when transferred to different work sites, and for a maximum of three days for return to their homes, in the event they were laid off. They did not receive per diem during vacation periods; but they did receive per diem for three days up to a maximum of six days if they were sick. Neither Lockheed nor Dynalectron withheld Federal income tax from the per diem payments made to their employees. Petitioner had come to Arizona in 1957, and at some time thereafter and prior to 1965, he opened and operated a proprietorship engaged in the business of repairing and rebuilding automobile water pumps, under the name of "Desert Proven Water Pump Rebuilders." On September 19, 1966, petitioner was first hired by Dynalectron. The address which he furnished to the company as his residence at that time was 5246 South Park Avenue, Tucson, Arizona, which was the business premises of his proprietorship. Petitioner closed the business down, but left the equipment in storage at the Park Avenue address for which he continued to pay rent and utilities. Petitioner's first assignment with Dynalectron was at George Air *373 Force Base at Victorville, California, where he remained from September 1966 to May 1, 1967. From May 1, 1967, until July 19, 1967, petitioner was assigned to Amarillo, Texas. On the latter date, petitioner was laid off by the company for approximately one month. During the period of the lay-off, petitioner returned to Tucson and stayed in a house owned by his mother-in-law. On August 21, 1967, Dynalectron rehired petitioner and sent him back to Amarillo where he remained until March 1968. From March 8, 1968, to September 20, 1968, petitioner was assigned to Mather Air Force Base in California, from which assignment he was transferred to Atlanta, Georgia. Petitioner was in Atlanta until March 1969, when Dynalectron assigned him to Lincoln, Nebraska. Petitioner arrived in Lincoln, but was unable to find housing for his family. He did not report to the air base, but returned to Tucson. He obtained a leave of absence from Dynalectron; and sometime in April or May 1969, the company sent him to Wrightstown, New Jersey. After only somewhat over a month, Dynalectron assigned petitioner to Belle Chasse, Louisiana, on June 19, 1969. Then, again after somewhat over a month, Dynalectron assigned *374 petitioner to Key Field at Meridian, Mississippi, where he remained for the remainder of the year 1969, and until March 15, 1971, when he was transferred to Hill Air Force Base in Utah. Petitioner was not advised by Dynalectron as to the length of time he would be assigned to any of the assignments made to him. During the year 1969, and at least during that portion of 1968 when petitioner was assigned to Atlanta, his wife and child accompanied him on each assignment. Mrs. Upton's mother, Mrs. Boone, owned two houses in Tucson, both located on the same lot. Mrs. Boone lived in one of the houses, and it appears that when petitioner was in Tucson, he and his wife and daughter would stay in the other house. Petitioner made some improvements to such house, but he does not expect to occupy the same as a residence. Petitioner is registered to vote in Tucson, and since entering the employ of Dynalectron he voted in Tucson in the Presidential election of 1968. During 1969, petitioner had an account at the Valley National Bank in Tucson which he had opened some years previously; after being assigned to Meridian, he also opened a checking account with a bank in that city at some time after *375 January 1, 1970. As mentioned above, petitioner closed down his proprietorship when he entered the employ of Dynalectron, and stored the machinery and equipment. His decision to store the machinery and equipment was prompted by the desire to retain it until he could be sure that his job with Dynalectron was going to work out satisfactorily. By 1969, he had decided to sellsuch machinery and equipment, and he took steps to that end. Sale was effected at some time after 1969. Petitioner visited Tucson once during 1969. Petitioner received $2,637 in per diem payments from Dynalectron during 1969. He did not include any per diem payments in gross income on his return for that year. In his statutory notice of deficiency, respondent determined that $1,197 of the per diem payments were includible in gross income, under section 61(a). By an amendment to his answer to conform the pleadings to the proof, respondent has sought to include an additional $1,440 of per diem payments in petitioner's income, and seeks an increased deficiency. OPINION It must first be determined whether the per diem payments received by petitioner from Dynalectron in 1969 are includible in his gross income *376 for that year. It is believed that the per diem payments when received by petitioner constituted gross income. In very broad and sweeping language, section 61(a)(1) provides that "gross income means all income from whatever source derived." The Supreme Court has construed this "broad phraseology" to evidence a Congressional intention "to tax all gains except those specifically exempted." Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 430. The per diem payments were "undeniable accessions to wealth, clearly realized and over which the [petitioner had] complete dominion," ( Commissioner v. Glenshaw Glass Co.,supra, p. 431); and the Code contains no provision exempting per diem payments from taxation. Manifestly, then, the respondent was correct in including in gross income all of the per diem payments ($2,637) which petitioner received in 1969. Leo C. Cockrell,38 T.C. 470, 477-478, affd. (8th Cir.) 321 F.2d 504; Darrell Spear Courtney,32 T.C. 334, 341. [4]
The question remains whether petitioner is entitled to deduct *377 any part or all of the per diem payments under section 162(a)(2) as expenses for travel while away from home in pursuit of his trade or business as an employee of Dynalectron. Leo C. Cockrell, supra, p. 479. In the Cockrell case, it was pointed out that the Supreme Court, in Commissioner v. Flowers,326 U.S. 465, rehearing denied 326 U.S. 812, had laid down three requirements that a taxpayer must meet to be entitled to deduct away-from-home expenses: The expense must be reasonable and necessary traveling expense; it must be incurred by a taxpayer while away from home; and it must be incurred in pursuit of business. In the present case, the parties differ only on the point of whether petitioner was away from home. In the case of Truman C. Tucker,55 T.C. 783, 786, the factors to be considered in determining whether a taxpayer should be treated as away from home for tax purposes were crystallized. It was there said: The purpose of allowing the deduction of living expenses while a taxpayer is "away from home" is "to mitigate the burden of the taxpayer who, because of the exigencies of his trade or business, must *378 maintain two places of abode and thereby incur additional and duplicate living expenses." Ronald D. Kroll,49 T.C. 557, 562 (1968). In furtherance of this purpose, when a taxpayer with a principal place of employment goes elsewhere to take work which is merely temporary, he may deduct the living expenses incurred at the temporary post of duty, because it would not be reasonable to expect him to move his residence under such circumstances. Emil J. Michaels,53 T.C. 269 (1969); Ronald D. Kroll,supra.For this purpose, temporary employment is the type which can be expected to last for only a short period of time. Beatrice H. Albert,13 T.C. 129, 131 (1949). Was petitioner's employment at each of his assignments in 1969 temporary or indefinite? Respondent concedes on brief that his assignments in Atlanta, Wrightstown and Belle Chasse were temporary; but he contends that the assignment to Meridian was indefinite. Respondent's position as to Meridian is not well-taken. Considering the contractual arrangements between Dynalectron and the Air Force, petitioner's employment arrangements with Dynalectron, and his *379 employment history from the time he went to work for the company in 1966 until he was assigned to Meridian in August 1969 -- all of which have been set out in the findings of fact -- it is believed that the Meridian assignment in 1969 must be regarded as only temporary. Respondent argues, correctly, that an assignment which is temporary in its inception may, with the passage of time, be transformed into an indefinite one. However, that point in time for transformation had not been reached insofar as petitioner's Meridian assignment was concerned, at the end of 1969. Thus, it is concluded that all four of petitioner's 1969 assignments were temporary. However, the evidence does not establish that petitioner maintained any home of a substantial nature elsewhere than at the four places where he was assigned in 1969. His family -- Mrs. Upton and their daughter -- accompanied him on each assignment, and the three of them worked, ate, slept -- in short, made their home -- at each of the cities of these assignments. Petitioner's living expenses were incurred in each of those cities, and he incurred none of those duplicate and additional living expenses in other localities, the burden of *380 which the deduction afforded by section 162(a)(2) is designed to mitigate, as this Court pointed out in the Tucker case. To be sure, Tucson, where petitioner contends his home was in 1969, was that at least until September 1966, when he was hired by Dynalectron. However, by 1969 (and probably much earlier) with his wife and daughter accompanying him to his places of employment, the evidence is persuasive that he had abandoned Tucson as his home, within the meaning of section 162(a)(2). His remaining ties to that community, where he visited only once in 1969, are not sufficient to qualify Tucson as his home. Summing it up, petitioner was at, not away from, his home during 1969 for the purposes of section 162(a)(2). Accordingly, he should not be allowed any deduction under section 162(a)(2) for 1969. * * * * *
In accordance with the foregoing, Decision will be entered for respondent.
Footnotes
1. DeQuincy V. Sutton was counsel of record for petitioners at the time of trial. Mr. Sutton died in August 1974, shortly after the last brief was filed. There is presently no counsel of record for petitioners.↩
2. All section references are to the Internal Revenue Code of 1954, unless otherwise specified.↩
3. The petitioner-husband in the present case, as well as all the other husband-petitioners, worked at Key Field in Meridian. It is this work at Meridian that is the common element that prompted the consolidation of the cases for trial.↩
4. See also Fred W. Phillips,T.C. Memo. 1973-58↩.